No. 21-1208

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

BRIAN WATSON
Petitioner-Appellant

v.

MICHELLE EDMARK, WARDEN,
NEW HAMPSHIRE STATE PRISON, Respondent-Appellee

_____

Appeal From An Order Of The United States District Court
For the District Of New Hampshire

_____

BRIEF FOR RESPONDENT-APPELLEE
MICHELLE EDMARK, WARDEN, NEW HAMPSHIRE STATE PRISON

JOHN M. FORMELLA
Attorney General

ANTHONY J. GALDIERI
Solicitor General

Elizabeth C. Woodcock
First Circuit Bar No.: 1041532
Senior Assistant Attorney General
Criminal Justice Bureau
33 Capitol Street
Concord, N.H. 03301-6397
(603) 271-3671

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................. 2

TABLE OF AUTHORITIES ......................................................................................... 3

ISSUE PRESENTED ..................................................................................................... 4

STATEMENT OF THE CASE ...................................................................................... 5

FACTS ............................................................................................................................ 6

    A.   The State's Case ................................................................................................. 6

    B.   The District Court's Decision: *Watson v. New Hampshire State Prison, Warde*n, Case No. 1:19-cv-95-JL ................................................................................... 19

SUMMARY OF THE ARGUMENT ........................................................................... 21

ARGUMENT ................................................................................................................ 22

    A.   Standard of Review ......................................................................................... 22

    B. The State Court's Findings Are Supported by the Record and Are Entitled to Deference. ...................................................................................... 24

CONCLUSION ............................................................................................................. 29

CERTIFICATION PURSUANT TO RULE 7(a)(7)(C) ............................................ 30

CERTIFICATE OF SERVICE ................................................................................... 31

# TABLE OF AUTHORITIES

**Cases**

*Abrante v. St. Amand*, 595 F.3d 11 (1st Cir. 2010)....................................................23

*Aspen v. Bissonnette*, 480 F.3d 571, (1st Cir. 2007).........................................22, 23

*Brown v. Payton*, 544 U.S. 133 (2005)....................................................................22

*Bullcoming v. New Mexico*, 564 U.S. 647 S.Ct. 2705 (2011) ..............14, 15, 16, 18

*Castillo v. Matesanz*, 348 F.3d 1 (1st Cir. 2003).....................................................23

*Crawford v. Washington,* 541 U.S. 36 (2004) ..........................................................14

*Foxworth v. St. Amand*, 570 F.3d 414 (1st Cir. 2009)..............................................23

*Furr v. Brady*, 440 F.3d 34 (1st Cir. 2006)..............................................................23

*Harrington v. Richter,* 562 U.S. 86 (2011)...............................................................23

*Knight v. Spencer*, 447 F.3d 6 (1st Cir. 2006) .........................................................22

*Melendez–Diaz v. Massachusetts*, 557 U.S. 305 S.Ct. 2527 (2009) .........14, 15, 17

*Scoggins v. Hall,* 765 F.3d 53 (1st Cir.2014) ..........................................................23

*Sleeper v. Spencer*, 510 F.3d 32 (1st Cir. 2007) ...............................................23, 24

*State v. Michaels*, 95 A.3d 648 (N.J. 2014)........................................17, 18, 26, 27

*State v. Watson*, 170 N.H. 720, 724 (2018) ..................................................... passim

*Teti v. Bender*, 507 F.3d 56 (1st Cir. 2007) .............................................................22

*Watson v. Warden, New Hampshire State Prison*, Case No. 1:19-cv-95-JL.............5

*Wiggins v. Smith,* 539 U.S. 510 (2003)....................................................................23

*Williams v. Illinois*, 567 U.S. 50 S.Ct. 2221, 183 L.Ed.2d 89 (2012) ..............14, 16

**Statutes**

28 U.S.C. § 2254(d)(2) (2006)...................................................................................22

## ISSUE PRESENTED

Whether the New Hampshire Supreme Court's factual findings with respect to the testimony of a toxicologist are supported by the trial court's record and, therefore, entitled to deference by this Court.

# STATEMENT OF THE CASE

The petitioner was charged with the sale of fentanyl with death resulting. N.H. Rev. Stat. Ann. § 318-8-B:26, IX. He was tried and convicted in the Belknap (New Hampshire) County Superior Court (*O'Neill*, J.). On February 7, 2017, he was sentenced to 20 years to life imprisonment, with five years of the minimum suspended. Doc. 4-1: 7.[1] The trial court also imposed a fine of $25,000, a statutory penalty assessment of $6,000, and $5,076.50 in restitution.

The New Hampshire Supreme Court affirmed the petitioner's conviction in his direct appeal. *State v. Watson*, 170 N.H. 720, 185 A.3d 845 (2018). He then filed a petition for a writ of habeas corpus in the United States District Court for the District of New Hampshire. *Watson v. Warden, New Hampshire State Prison*, Case No. 1:19-cv-95-JL. The district court granted the respondent's motion for summary judgment. Doc. 16: 1-2. The court also issued a certificate of appealability. Doc. 16: 2.

This appeal followed.

---

[1] References to the record are as follows: "Doc. _:_" refers to the documents filed in the United States District Court for the District of New Hampshire and page number. "PB:_" refers to the petitioner's brief filed in this Court and page number. "Tr.: _" refers to the trial transcript in the Belknap County Superior Court and page number.

<h1 style="text-align:center">FACTS</h1>

**A.      The State's Case**

**1.      The Mother's Testimony**

On the evening of April 2, 2015, the victim's mother returned to her home in Tilton late from meetings at the school where she was the director.  Tr.: 24, 26--28. The victim had just had his hair cut and his mother teased him, "telling him how hot he looked."  Tr.: 28.  Then she told him that she loved him and went to bed at 11:38 p.m.  Tr.: 28.

On the morning of April 3, 2015, the victim's mother got up at 6:15 a.m. and could hear his television, so she thought that he was already awake.  Tr.: 26, 30, 31.  She called to him and asked why he was awake so early, but he did not answer, and she went into his bedroom.  Tr.: 26.  She saw the victim "sitting up on the end of his bed with his phone" and said, "[Y]ou're not funny, stop it."  Tr.: 26. The victim said nothing. Tr.: 26.  He was wearing the same clothes that he had been wearing the previous evening.  Tr.: 28.  His mother "kept walking closer and, [was] like, this isn't funny anymore; stop it you're scaring me."  Tr.: 26.  She "reached out and touched him and he was stiff and then [she] reached up under his shirt and he was cold."  Tr.: 26. He was 21 years old.  Tr.: 46.

She called 911.  Tr.: 27.  When she tried to move the victim, his cell phone fell out of his hand.  Tr.: 27.

### 2.   Days Before the Victim's Death

The victim spent the Wednesday before he died with his aunt, helping her with her dogs.  Tr.: 30, 63.  The dogs were pedigree animals and competed in national dog shows.  Tr.: 63-65.  The aunt's dog had a new litter of puppies.  Tr.: 63.  The aunt told the mother that the victim had "been acting kind of funny."  Tr.: 31.

The victim's aunt recalled that the victim seemed to move with a "slowed movement."  Tr.: 70.  She asked the victim if he was using drugs and he said that he was not.  Tr.: 70.  The aunt told the victim's mother that she suspected drug use.  Tr.: 69.  She added that the victim had loaned his stepfather some money and the stepfather repaid the loan just before the victim's death.  Tr.: 71-72.

The victim's brother had abused pills, but the victim's mother had never worried about the victim and drug use.  Tr.: 31.  The mother kept urine tests to test the brother for drug use and, after her conversation with the aunt, she gave one of the tests to the victim, but he passed it.  Tr.: 31.

### 3.   Teanna Bryson's Testimony

Teanna Bryson was in a romantic relationship with the petitioner.  Tr.: 300.  She knew the victim from Winnisquam High School, but she did not graduate.  Tr.: 302, 305.  On March 22, 2015, she made contact with the victim through Facebook and asked if he remembered her.  Tr.: 306, 411.  After she heard back from him,

she sent him a second message, asking him if he took drugs and telling him that she could provide him with "beyond fire" fentanyl. Tr.: 307-08. The contact was her idea, but she made contact with the victim "to get rid of stuff" for the petitioner. Tr.: 308. The victim responded that he lived in Tilton, that he had $20.00, and that he wanted to "try this shit out." Tr.: 309. Bryson responded that she could be in Tilton shortly. 310. The victim gave her his telephone number. Tr.: 312.

On March 23, 2015, after some messaging back and forth, Tr.: 416, the victim sent Bryson a message that he had been able to buy some suboxone, but that he "[m]ight still want to try it when [he was] out of work." Tr.: 319. Bryson responded that, if he injected the fentanyl, the drug that she had to sell was "severely intensifying." Tr.: 319. She sent the victim a description of the car that she was in, stating: "I'm in a big dark blue Ford Excursion. Just hop in the back seat and I'm with my friend, he's an older guy, so that's why it's a big vehicle. I don't drive." Tr.: 320. On March 28 and 31, 2015, the victim attempted to contact Bryson, but she did not respond to either message. Tr.: 421.

When the time came for the sale, Bryson did not go with the petitioner to sell to the victim. Tr.: 322. She had "cotton fever" from accidentally shooting cotton into her veins and stayed home. Tr.: 323. Cotton fever causes shaking, sweating, and makes a person feel "really, really cold." Tr.: 323.

After the sale, Bryson learned that the victim had died of an overdose. Tr.: 321. She sent the petitioner a text message, saying, "OMG, B, our shit killed someone." Tr.: 326. She then sent a second message, saying, "We killed one of our customers. I'm devastated and shocked, I am freaking out." Tr.: 326. The petitioner responded, "What? Who?" Tr.: 326. Bryson responded that the victim had "overdosed on our dope." Tr.: 327. To this, the petitioner responded, "What? No way." And then he added, "Say nothing to no one. Be home as soon as I can." Tr.: 327.

### 4.    Evidence from the Victim's Bedroom

Tilton Detective Brian Kydd-Keeler recalled that, when he went into the victim's bedroom, there was an uncapped hypodermic needle sitting in front of the victim. Tr.: 114. There was a second hypodermic needle, which had liquid in it, in a drawer in the TV stand. Tr.: 128. The victim's cell phone was in between his feet. Tr.: 114. There was a spoon at his feet. Tr.: 114. There was a brown residue on the spoon. Tr.: 118. The spoon had burn marks that were consistent with drug use. Tr.: 121. The detective also found a tourniquet on the TV stand. Tr.: 117. The detective found three bags in the wastebasket in the victim's bedroom. Tr.: 125. The bags contained a "tan-ish" residue. Tr.: 126.

After they left and the victim's body was removed, the mother began cleaning because she cleaned when she was upset. Tr.: 33. She opened the bottom

drawer of the TV stand in her son's room and found some hypodermic needles and "a packet of something." Tr.: 33, 34. She called the police and asked them to return and "check it out." Tr.: 33.

Patrolman Noelle Glenn went to the home that afternoon and took photographs before recovering the needles. Tr.: 74-75. When the mother brought her to the victim's bedroom, Patrolman Glenn found needles with liquid in them in a drawer in the TV stand. Tr.: 75, 87. Some of the syringes looked as if they had been used. Tr.: 89. Patrolman Glenn also found a baggie containing a brownish powder. Tr.: 75-76. The State Police Forensic Laboratory tested the powder and it was positive for fentanyl. Tr.: 291-92.

### 5.    The Cell Phone Records

The mother gave the police permission to take the victim's cell phone. Tr.: 32-33. The police obtained a search warrant for the phone and unlocked it by going to the morgue and pressing the victim's thumb to it. Tr.: 123. When the police opened the phone, they found text messages in it. Tr.: 144-45.

The victim had exchanged messages with a person listed in the phone as "Brian D." Tr.: 386-91. The victim sent messages to telephone number 603/223-7985, a telephone number registered to the petitioner. Tr.: 386, 424. The messages, which set up the drug sale, occurred between 8:00 a.m. and 9:00 a.m. on April 2. Tr.: 391. Later that evening, the victim sent the petitioner another text

message, telling him that he was looking for "two g's." Tr.: 392. When the petitioner responded that the cost was $240, the victim answered that he was planning to go to the Hannaford grocery store in Franklin to get money and asked if the petitioner would like to meet him there. Tr.: 392.

The State introduced a receipt from Hannaford, dated April 2, 2015 at 10:04 p.m. Tr.: 406-07. The State also introduced a videotape from Hannaford showing the victim enter Hannaford and leave a few minutes later, carrying bags and his cell phone. Tr.: 408-09.

Finally, there was an unsent message on the victim's phone. Tr.: 386. The message read, "It's good, but I think the first…" and then ended. Tr.: 386.

### 6. The Forensic Toxicologist's Testimony

Daniel Isenschmid, a forensic toxicologist at the National Medical Services (NMS) Laboratories testified. Tr.: 243. He had worked at NMS for 5½ years; before that he was employed as the chief toxicologist at the Wayne County (Michigan) Medical Examiner's Office in Detroit. Tr.: 246. He testified that, in 2005, the Wayne County office had "about 236" fentanyl fatalities. Tr.: 247. He participated in presenting data on those fatalities to the American Academy of Forensic Sciences. Tr.: 247.

NMS provided a variety of services, including testing biological samples for narcotics in cases from a medical examiner's case. Tr.: 244. After all the

laboratory testing on a sample was completed, Dr. Isenschmid or another toxicologist would "review the entire case in the context of all of the work that was done to issue a final report." Tr.: 250. Dr. Isenschmid signed the final toxicology report issued in the victim's case. Tr.: 253. He noted that the analyst did not "know what [he is] looking for." Tr.: 255.

NMS found marijuana, fentanyl, and its "metabolic breakdown product," norfentanyl in the victim's blood. Tr.: 257. When NMS tested the victim's urine, it found a "presumptive positive" for marijuana and opiates. Tr.: 257. Fentanyl, Isenschmid explained, was a controlled substance with potential for therapeutic use, but a "high potential" for abuse. Tr.: 262. He said that "when fentanyl is used for pain management in an individual with chronic pain, typically blood concentrations are in the order of one to maybe as high as four nanograms per milliliter when it's used therapeutically." Tr.: 259. According to Dr. Isenschmid, NMS found 21 nanograms of fentanyl per milliliter in the victim's blood, which was a "relatively large concentration of fentanyl." Tr.: 258. A concentration of 21 nanograms per milliliter, Isenschmid explained, "could be enough to shut down [a person's] breathing process" and cause death. Tr.: 261-62.

On cross-examination, Dr. Isenschmid said that his responsibility "was to actually review all of the testing results that were generated by the laboratory." Tr.: 265. On redirect, Dr. Isenschmid described his role as follows:

> [W]hen I review a case I basically look at all the documentation we have on the case. I look at the chain of custody, I look at the requisition, I make sure everything has been entered properly into the computer system. Then I review all of the instrument tracings to make sure that what was reported was in fact what we have in those tracings.

Tr.: 283.  He continued:

> [I]f the sample had to be repeated for whatever reason, I would check to see why it was repeated, was it repeated -- sometimes we repeat samples because the concentrations are so high we have to reanalyze the sample on a dilution. Sometimes we might have a control failure. If we have a control failure I want to know why we did, and what was done, and things like that. So I look at all of that.
>
> And then finally in the context of the final reported results, I look at the history of the case. If the medical examiner provides us with something of the history that was not included in our analysis, we might ask the medical examiner -- go back to them and say, you said this drug is potentially something by history, would you like us to do a specific test for it.

Tr.: 283-84.

### 7.    The Petitioner's Statements

On May 8, 2015, the petitioner was arrested and then interviewed. The interview was recorded and was played for the jury at trial.  Tr.: 478.  Detective Corporal Nathan Buffington showed the petitioner a picture of the victim after he had died.  *Watson*, 170 N.H. at 724.  The petitioner's telephone number was consistent with the police records of telephone messages.  Tr.: 478.  The state court noted that the petitioner made several "inculpatory statements regarding the sale of

a controlled drug with death resulting charge." *State v. Watson*, 170 N.H. 720, 724 (2018).

**B.    *State v. Watson*, 170 N.H. 720 (2018)**

The petitioner raised the following claims before the state court:  "that the Superior Court (*O'Neill,* J.) erred by: (1) denying his motion to suppress statements allegedly obtained in violation of his Miranda rights; and (2) allowing a forensic toxicologist, Dr. Daniel Isenschmid, to testify to the results of toxicology tests that he did not conduct." *Watson*, 170 N.H. at 722  (internal citation omitted).

With respect to the second assertion, which is at issue here, the state court found:

> Since *Crawford*,[2] the Supreme Court has released three decisions addressing the application of the Confrontation Clause to forensic-testing evidence. They are *Melendez–Diaz*,[3] 557 U.S. 305, 129 S.Ct. 2527; *Bullcoming*,[4] 564 U.S. 647, 131 S.Ct. 2705; and *Williams v. Illinois*, 567 U.S. 50, 132 S.Ct. 2221, 183 L.Ed.2d 89 (2012) (plurality opinion). In *Melendez–Diaz*, the trial court admitted into evidence three "certificates of analysis" setting forth "the results of forensic analysis which showed that material seized by the police and connected to the defendant was cocaine." *Melendez–Diaz,* 557 U.S. at 307, 308, 129 S.Ct. 2527 (quotation omitted). The trial court admitted the notarized certificates, without live testimony, "pursuant to state law as prima facie evidence of the composition, quality, and the net weight of the narcotic analyzed." *Id.* at 309, 129 S.Ct. 2527 (quotation and ellipsis omitted). After he was convicted, the defendant appealed, arguing "that admission of the certificates violated his Sixth Amendment right to be confronted with the witnesses against him." *Id.*

---

[2] *Crawford v. Washington*, 541 U.S. 36 (2004).
[3] *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009).
[4] *Bullcoming v. New Mexico*, 564 U.S. 647 (2011).

*Watson*, 170 N.H. at 729.

The state court observed that the *Melendez-Diaz* Court wrote, in a footnote, that it did not hold, "and it [was] not the case, that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case." *Watson*, 170 N.H. at 729 (quoting *Melendez-Diaz*, 557 U.S. at 311 n.1) (internal quotation marks omitted). The state court continued that the *Melendez-Diaz* court stated that its decision did not require "that everyone who laid hands on the evidence must be called." *Id.* Rather, "gaps in the chain of custody normally go to the weight of the evidence rather than its admissibility." *Id.*

The state court then turned to *Bullcoming,* which involved the admission of blood alcohol concentration (BAC) through the testimony of "a different laboratory scientist who had neither observed nor reviewed the work of the certifying analyst." *Watson*, 170 N.H. at 730. The court noted that the United States Supreme Court reversed the conviction, stating that the:

> "surrogate testimony of the kind [the testifying scientist] was equipped to give could not convey what [the certifying analyst] knew or observed about the events his certification concerned, *i.e.,* the particular test and testing process he employed. Nor could such surrogate testimony expose any lapses or lies on the certifying analyst's part." "In short," the Court concluded, "when the State elected to introduce [the certifying analyst's] certification, [the certifying analyst] became a witness [the defendant] had the right to confront."

15

*Watson*, 170 N.H. at 731 (quoting *Bullcoming*, 564 U.S. at 661-63) (internal citations omitted)).

The state court considered *Williams*, which involved a DNA profile. *Watson*, 170 N.H. at 732. The state court stated that the plurality opinion in *Williams* concluded that:

> [E]ven if the report containing the DNA profile produced by the private laboratory had been admitted into evidence for the truth of the matters asserted therein, the Confrontation Clause would not have been violated because the report "was not prepared for the primary purpose of accusing a targeted individual." *Williams*, 567 U.S. at 84, 132 S.Ct. 2221. Rather, "its primary purpose was to catch a dangerous rapist who was still at large, not to obtain evidence for use against [the defendant], who was neither in custody nor under suspicion at that time." *Id.* Moreover, nobody at the private laboratory "could have possibly known that the profile that it produced would turn out to inculpate [the defendant]—or for that matter, anyone else whose DNA profile was in a law enforcement database." *Id. a*t 84–85, 132 S.Ct. 2221.

*Watson*, 170 N.H. at 732.

The state court then found as follows:

> As a fact witness, Isenschmid gave a general overview of the process that NMS uses for samples that arrive from out-of-state. He testified that the specimens are in a sealed box that is delivered overnight directly to a "secure processing area." At that point, NMS "start[s] a chain of custody," recording into a computer the condition of the box, the seals, and the specimens themselves. A portion of the original sample is then transferred into a tube and sent to a different area for testing. NMS documents "who made that transfer to the tube, and who received it." NMS then has "a chain of custody on who prepared the sample for analysis, who initially reviewed the results, and who did the secondary review of the results." The first person, who reviews

> "the data that comes off the instrument[,] ... checks to make sure that all of the calibrations and controls worked properly." The first reviewer "verifie[s] all the quality assurance data" and enters the results into the computer system. The second reviewer checks "to see [that] all the data that the first reviewer put into the computer system was all properly transcribed and properly entered." "[F]inally, after all the laboratory testing is complete[,] a toxicologist[,] such as [Isenschmid,] will then review the entire case in the context of all the work that was done to issue a final report that's provided back to the client." According to Isenschmid, approximately 12 NMS employees handled the victim's blood and urine samples: five employees "dealt with the sample[s] coming in" and another seven prepared the samples for testing.

*Watson*, 170 N.H. at 733-34. "[A]lthough Isenschmid did not 'do the laboratory work' on the victim's blood or urine or supervise those who did, he 'actually review[ed] all of the testing results that were generated by [NMS]' in this case, and issued and signed the report describing those results. The report, Isenschmid testified, accurately reflected his conclusions and findings." *Watson,* 170 at 734.

The state court, relying in part on *State v. Michaels*, 95 A.3d 648, 673 (N.J. 2014), distinguished the United States Supreme Court cases from the case presented by the petitioner. The state court noted that in *Melendez-Diaz*, "no witness was offered to testify to the statements contained in the state lab's forensic document that was admitted into evidence," which was not the case in in the Watson trial. *Watson*, 170 N.H. at 735.

The court distinguished *Bullcoming* by noting that the "forensic report was admitted through the testimony of a co-analyst who did not observe the work of the

... analyst who performed the testing and who did not serve as a supervisor or reviewer responsible for certifying the blood alcohol results obtained by the analyst whose work was referenced in the report." *Id.* (quoting *Michaels*, 95 A.3d at 673) (internal quotation marks omitted).

Turning again to the facts presented by the Brian Watson trial, the state court observed that:

> Isenschmid reviewed "all the documentation" in the case, including the chain of custody, and ensured that all of the information had been correctly entered into the NMS computer system. Isenschmid personally reviewed the "actual instrument data" and made sure that the data were accurately entered into the NMS computer. Further, he "actually reviewed all of the testing results." He also issued and signed the toxicology report that described the testing results and testified that the report accurately reflected his findings and conclusions. His "participation in preparing the report and developing the substantive conclusions contained therein was real and direct." The fact that Isenschmid was testifying regarding his own report "distinguishes him from the co-analyst in Bullcoming, who merely presented a blood alcohol report prepared by another [laboratory] co-employee." Isenschmid "was not repeating the findings and conclusions of the analysts who manned the gas chromatography/mass spectrometry devices."

*Watson*, 170 N.H. at 735 (citations omitted). The court noted that "contrary authority exist[ed]," but that the decision "comport[ed] with those of at least seven federal courts and 21 state courts, which, in opinions issued since 2012, have found no Confrontation Clause violation under similar circumstances." *Watson,* 170 N.H. at 737-38.

**B. The District Court's Decision:** *Watson v. New Hampshire State Prison, Warden*, Case No. 1:19-cv-95-JL

On January 25, 2019, the petitioner filed a petition for a writ of habeas corpus in the United States District Court for the District of New Hampshire. Doc. 1. On September 9, 2019, the respondent filed a motion for summary judgment and supporting memorandum of law. Docs. 6, 6-1. On April 22, 2020, the court ordered additional briefing, Doc. 11, to which both parties responded, Docs. 12, 13. On September 29, 2020, the district court held a hearing in which both parties were given the opportunity to argue the merits of the petition and the motion for summary judgment. Doc. 28: 1.

At the hearing, the petitioner contended that the trial court erred in allowing Dr. Isenschmid to testify regarding the toxicology results at NMS Laboratory. The petitioner contended that there were "11 other individuals involved in the touching and preparation and execution of a report," Doc. 28: 6, and that the State's failure to call the others involved created "a problem with confrontation," Doc. 28: 10. The petitioner contended that Dr. Isenschmid was "so far removed from the actual analysis" of the samples that he should not have been allowed to testify. Doc. 28: 12.

The respondent contended that, in its opinion affirming the petitioner's conviction, the New Hampshire Supreme Court did not misapply clearly established federal law. Doc. 28: 20. The respondent also contended that the facts

developed at trial supported the New Hampshire Supreme Court's ruling.  Doc. 28: 25.

The court then noted that the standard of review in federal habeas proceedings is very narrow.  Doc. 28: 30-32.  The court said that the New Hampshire Supreme Court's opinion was very detailed.  Doc. 28: 33 (THE COURT: "I'm not sure I can improve on what Chief Justice Lynn said" about Dr. Isenschmid's testimony.).  At the close of the hearing the court gave both parties to file additional notices of authority, but stated that it was not persuaded that the New Hampshire Supreme Court's opinion was incorrect.  Doc. 28: 52.  Both sides filed additional pleadings, Doc. 14: 1-10, Doc. 15: 1-3, and, on October 26, 2020, the district court issued an order denying federal habeas corpus relief, Doc. 16: 1-2. The court issued a certificate of appealability in that same order.  Doc. 16: 2.

**SUMMARY OF THE ARGUMENT**

Although the petitioner contends that the record did not support the New Hampshire Supreme Court's factual findings, the record demonstrates otherwise. The factual findings are fully supported by the record. Indeed, on several occasions, the court used direct quotes from the testimony at trial. The petitioner, therefore, has not shown by clear and convincing evidence that the factual findings were incorrect. Since the New Hampshire Supreme Court did not misapply clearly established federal law in reaching its conclusions, the petitioner has not demonstrated that he is entitled to habeas corpus relief.

# ARGUMENT

## The District Court Correctly Granted The Respondent's Motion For Summary Judgment.

### A.    Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ('AEDPA'), a federal court cannot grant a habeas corpus petition on a claim adjudicated on the merits in state court unless that ruling "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," *Knight v. Spencer*, 447 F.3d 6, 11 (1st Cir. 2006)  (internal citation and quotation marks omitted), or "'resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding,'" *Teti v. Bender*, 507 F.3d 50, 56 (1st Cir. 2007) (quoting 28 U.S.C. § 2254(d)(2) (2006)).

A state court decision is "contrary to" established Supreme Court authority if it results from applying a rule that contradicts governing law or is inconsistent with a Supreme Court decision in a case with essentially indistinguishable facts.  *See Aspen v. Bissonnette*, 480 F.3d 571, 574 (1st Cir. 2007); *see also Brown v. Payton*, 544 U.S. 133, 141 (2005) ("A state-court decision is contrary to this Court's clearly established precedents if it applies a rule that contradicts the governing law

set forth in our cases, or if it confronts a set of facts that is materially indistinguishable from a decision of this Court but reaches a different result.").

A state court ruling is an "unreasonable application" of controlling Supreme Court authority if the state court states the correct legal principle but applies the principle unreasonably to the petitioner's case. *Aspen*, 480 F.3d at 574. The petitioner must show "'that the state court's ruling on the claim ... was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Scoggins v. Hall,* 765 F.3d 53, 57 (1st Cir.2014) (quoting *Harrington v. Richter,* 562 U.S. 86, 103 (2011)), *cert. denied,* 135 S.Ct. 1007 (2015).

Habeas relief is available only if the state court's decision was objectively unreasonable, not simply erroneous or mistaken. *See Wiggins v. Smith,* 539 U.S. 510, 520-21 (2003); *Sleeper v. Spencer*, 510 F.3d 32, 38 (1st Cir. 2007); *Furr v. Brady*, 440 F.3d 34, 37 (1st Cir. 2006); *see also Castillo v. Matesanz*, 348 F.3d 1, 9 (1st Cir. 2003) ("If it is a close question whether the state decision is in error, then the state decision cannot be an unreasonable application."). The decision is objectively unreasonable if it "'evinces some increment of incorrectness beyond mere error.'" *Abrante v. St. Amand*, 595 F.3d 11, 15 (1st Cir. 2010) (quoting *Foxworth v. St. Amand*, 570 F.3d 414, 425 (1st Cir. 2009)). In addition, "a determination of a factual issue made by a State court shall be presumed correct,"

and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Sleeper*, 510 F.3d at 38 (deference applies whether the trial court or appellate court made the fact-finding).

### B. The State Court's Findings Are Supported by the Record and Are Entitled to Deference.

The petitioner contends that there is a "genuine dispute about an issue of material fact" concerning the testimony of Dr. Isenschmid. PB: 2. He contends that, because this genuine dispute exists, that summary judgment should not have been granted. PB: 3. He bases this contention on three points: (1) Dr. Isenschmid "was not involved in testing the samples," PB 3; (2) Dr. Isenschmid's involvement was distinguishable from a witness in a State of New Jersey case, PB: 7; and (3) Dr. Isenschmid did not offer an opinion, PB: 9.

The petitioner also contends: (1) that Dr. Isenschmid was not a supervisor or an initial reviewer, PB 10; and (2) that Dr. Isenschmid did not participate in the testing, and yet was allowed to offer an opinion about the results, PB: 12. He concludes that the state court's finding that Dr. Isenschmid's involvement was "real and direct," *Watson*, 170 N.H. at 735, is not supported by the record and that, therefore, it is not entitled to deference. PB: 13.

The record, however, demonstrates otherwise.

The state court found:

> According to Isenschmid, approximately 12 NMS employees handled the victim's blood and urine samples: five employees "dealt with the sample[s] coming in" and another seven prepared the samples for testing.

> Isenschmid testified that when he reviews a case, he "look[s] at all the documentation," including "the chain of custody" and the "requisition," and he "make[s] sure everything has been entered properly into the computer system." Isenschmid testified that "if the sample had to be repeated for whatever reason,… [he] check[s] to see why it was repeated." If there is "a control failure," he "want[s] to know why" it occurred "and what was done."

*Watson*, 170 N.H. at 734; *see also* Tr.: 267 (12 people), Tr.: 283 (chain of custody, requisition, computer system, repeated sample, control failure). The court added that Dr. Isenschmid reviewed "all of the instrument tracings to make sure that what was reported was in fact what [NMS had] in the tracings." *Watson*, 170 N.H. at 734; Tr.: 283. He defined instrument tracings as "the actual instrument data." *Watson*, 170 N.H. at 734; Tr. 285.

Dr. Isenschmid then testified that there were "were three compounds found in the victim's blood: '[o]ne was a breakdown of marijuana,' another was fentanyl, and a third was norfentanyl, a 'metabolite breakdown product' of fentanyl." *Watson*, 170 N.H. at 734; *see also* Tr.: 257. According to the state court's opinion, Dr. Isenschmid testified that "the victim's urine tested positive for marijuana and opiates." *Watson*, 170 N.H. at 734-35; Tr.: 257. The state court found that Dr. Isenschmid "further testified that the level of fentanyl in the victim's blood was '21

nanograms per milliliter,' which, he opined, is 'a relatively large concentration of fentanyl,' and that the level of norfentanyl was '2.2 nanograms per milliliter.'" *Watson*, 170 N.H. at 735; Tr.: 258. Finally, the court found that Dr. Isenschmid "then opined that the difference between the fentanyl and norfentanyl levels in the victim's blood indicated that the victim ingested a large dose of fentanyl and that he died 'very shortly' after doing so.'" *Watson*, 170 N.H. at 735; Tr.: 262 (DR. ISENSCHMID: "Basically death would have occurred very shortly after the administration of the drug.").

The court's findings are supported by the record, and this Court owes those findings deference, the request for federal habeas corpus relief must be denied.

The petitioner also argues that Dr. Isenschmid's involvement in this case is distinguishable from that of the expert in *State v. Michaels*. PB: 13-14. It is not clear what merit this claim has. After all, this Court is not charged with determining if the New Hampshire Supreme Court correctly applied law articulated by the New Jersey Supreme Court. If the petitioner felt that the reliance on the *Michaels* case was ill-founded, he could have filed a motion to reconsider with the state court. *See N.H. Sup. Ct. R.* 22. This he did not do. His argument about the *Michaels* case, therefore, is not properly presented.

But if the New Jersey court's opinion is properly considered by this Court in reviewing the district court's ruling and that of the state court, the case does not

support the petitioner's contention that the state court erred. The *Michaels* case addressed the same issue presented by the petitioner's appeal. The *Michaels* court described the expert's responsibilities as follows:

> At trial, the State introduced testimony from Edward Barbieri, Ph.D., an assistant supervisor and toxicology technical leader from the private laboratory that had performed the testing on defendant's blood sample and issued a report certifying the test results. Dr. Barbieri was responsible for supervising the technicians and analysts who were involved in the gas chromatography/mass spectrometry testing. He also was responsible for their adherence to the laboratory's policies and protocols for the testing procedures. He had reviewed the test results and satisfied himself that the test data accurately identified and quantified the substances found in defendant's blood, and he had signed and certified the laboratory results set forth in the report.

*Michaels*, 95 A.3d at 651.

The *Michaels* court concluded that "a defendant's confrontation rights are not violated if a forensic report is admitted at trial and only the supervisor/reviewer testifies and is available for cross-examination, when the supervisor is knowledgeable about the testing process, reviews scientific testing data produced, concludes that the data indicates the presence of drugs, and prepares, certifies, and signs a report setting forth the results of the testing." *Id.* Dr. Isenschmid's duties fit this description. Notably, the laboratory involved in the *Michaels* case is the same laboratory that performed the tests in this case: NMS. *Id.* at 654.

The petitioner has not demonstrated that, under clearly established federal law, the state court was incorrect. Although he has challenged Dr. Isenschmid as

the "wrong witness," he has not shown that the state court misunderstood the facts developed at trial when it concluded otherwise. He has not shown that he is entitled to habeas corpus relief on this claim.

# CONCLUSION

WHEREFORE, the respondent respectfully requests this Court to affirm the judgment of the United States District Court for the District of New Hampshire.

Respectfully Submitted,

Michelle Edmark, Warden,
New Hampshire State Prison, Respondent.

By the Warden's attorneys,

JOHN M. FORMELLA
Attorney General

ANTHONY J. GALDIERI
Solicitor General

*/s/ Elizabeth C. Woodcock*
Elizabeth C. Woodcock
First Circuit Bar No.: 1041532
Senior Assistant Attorney General
Criminal Justice Bureau
33 Capitol Street
Concord, NH  03301-6397
Phone: (603) 271-3671
Elizabeth.Woodcock@doj.nh.gov

# CERTIFICATION PURSUANT TO RULE 7(a)(7)(C)

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 37(a)(7)(B) because this brief contains 5,746 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

November 29, 2021

*s/Elizabeth C. Woodcock*
Elizabeth C. Woodcock

# CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that I have served the petitioner, who is represented by Mark Sisti, Esq., 387 Dover Road, Chichester, NH 03258, through this Court's electronic filing system.

*/s/ Elizabeth C. Woodcock*
Elizabeth C. Woodcock